We're happy to hear argument in our second case, number 174204. Oh, no, I'm sorry. Number 171722. As soon as the lawyers are ready. Mr. Gordon. Mr. Gordon, whenever you're ready. Good morning and may it please the court. The Cody's retaliation claims in this case failed for two distinct reasons. First, the Cody's failed to prove a prima facie case under either of the two retaliation statutes that were involved. Second, the Cody's failed to carry their ultimate burden of proof under the False Claims Act, while Mantech did carry its burden of proof under the DCWPA. The focal point of this case is the time after Mantech became aware of the existence of this suit. Now, all of the charges in the original complaint were either abandoned or dismissed. And by the time the case went to trial, the whole focus was on Mantech's reaction to the unsealing and disclosure of the complaint of this case. The time frame between the disclosure, which was on December 23rd, 2014, and the subsequent terminations of the Cody's employees was too great under the established law of this circuit to provide an inference of causation. And so the issue becomes whether or not there was any evidence that would fill in that gap. There was none. The district court said that there were two items of evidence that the jury could have relied on to fill that gap. The first was the prior history of antagonism between Mantech and the Cody's, principally Kevin Cody, during the period in 2012, 2013, 2014. And the district court said, you know, the jury could have looked at that, and even though there was no protected activity, court had so ruled in its summary judgment ruling prior to trial, even though there's no protected activity there, the jury could rationally have concluded that this suit became the last straw. Now, the difficulty with that argument, the reason that it's contrary to the law, is that the law is that you cannot infer causation on facts that occurred before the plaintiff's protected activity. And the protected activity here is the unfiling of the suit. It's the Mantech becoming aware of the suit. And the court so ruled in the Hall v. Graystar management case. That is the law, and it's a matter of logic. And so the court's last straw rationale goes completely contrary to that, because that would open the door to looking at prior history. And in fact, the court is going even farther, and in the Francis v. Booz Allen and Hamilton case, it's made the point that logically, if there's a prior history between the parties before the protected activity occurs, then that undercuts, rather than bolstering, any inference of causation. The district court said there was a second reason, a second piece of evidence. You know, let me assess this. The point you just made about the prior history undercutting the effect that might be attributed to the filing suit, is that theory available where the issue is whether or not the act by the employer was a contributing cause? I mean, I can see that as perhaps fatal to a situation where there might be but-for causation, but the contributing, whether or not something's a contributing cause is pretty wide open. So I'm not sure that argument flies. In this case, where the judge charged a jury, anything done wrong had to be just a contributing cause. Well, Your Honor, first of all, the False Claims Act retaliation count does require but-for causation. Right, but you've been-I had the same or a similar problem. It seemed to me your argument was lumping in what could be an argument under two different statutes with different standards and a different person that has-carries the burden of proof in one claim. The ultimate burden of proof. And I'm not sure that that really works for you with respect to one of these statutes. Well, then let's take it-the court, in terms of the logical inference of filling the gap, there's no difference between whether it's a contributing-I don't see where the logical difference is between whether it's a contributing cause or whether it's but-for causation. If you're talking about filling the gap, events that occurred prior to the protected activity simply cannot, as a matter of logic, lead to an inference of causation for something that occurs after the protected activity. I'm not sure they can if they're one of the causes, but the protected activity is also a cause, so the protected activity contributes to the harm. I mean, just as a matter of semantics. You wrote a good brief. You must understand that. Well- It maybe is not but-for, but could contribute still. All right. Then let's-let me discuss that, because even if the court feels, concludes, that that would be all right in terms of a prima facie case under the DCWPA, you still have the issue about the ultimate burden under the DCWPA, which I'll turn to quite shortly. But certainly, under the False Claims Act, which has-and both of these charges here, both of these have independent significance. The COTI is pursued both for a reason, because they get relief under the False Claims Act that they don't get under the DCWPA. So it cannot clearly suffice under the False Claims Act. The other factor that the district court concluded that the jury could rely on was the fact that Mantec had placed the COTIs on administrative leave. And it was undisputed that Mantec placed them on administrative leave because of the suit. Now, the law is clear, we submit, that administrative leave is not an adverse employment action and that it cannot be evidence of retaliation. This case is an excellent example. Two senior executives of Mantec have publicly accused Mantec of defrauding its customer, the government, on the biggest contract that Mantec has. And these executives are the people that have been in charge of that contract. And one of them, namely Muge Coti, is the primary point of contact with the government customer, because she is the program manager. So in these circumstances, what is Mantec to do when this complaint is made public? The Supreme Court answered that issue, we submit, in the Laudermill case when it said, if the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay. That is exactly what Mantec did here. Mantec placed both of the Cotis on paid administrative leave and hired an outside independent expert to evaluate and examine the allegations they had made. So you've now taken both of the items of evidence that the district court relied on and they have come out, at least with respect to the False Claims Act, they're out of the mix. There is no prima facie case. That should be the end. Is there a difference in how the court considered this issue of administrative leave? As I understand it, Judge Stringa suggested that the issue was not whether or not administrative leave constituted an adverse employment practice, but whether or not it was relevant or probative of retaliatory intent. Is there a difference? There's not, Your Honor, for the same reason that it is not an adverse employment action. It cannot be evidence of retaliation. What about the fact that, at least with respect to Mrs. Cotis, she never came off of administrative leave? Well, neither of them came off of administrative leave, Your Honor, to acknowledge that. But the point is that Ms. Cotis remained on administrative leave even after her husband was terminated. And she was not terminated, even though she had stayed on for months beyond him, until the Army eliminated her position, the program manager position, from the contract. And then, when the Army did that, Mantec terminated her, but not only her, it also terminated the acting program manager who had been appointed when she had been placed on administrative leave. So that's an intervening event, and her departure is six months after the disclosure of the suit. Wasn't there evidence in the record that the company routinely placed folks who had been, who had lost a position for some reason, they routinely placed them elsewhere? No, there wasn't. The evidence was not that robust, Your Honor. The evidence was that Mantec had a policy where, if it was going to let an employee go, would try to look for a position for them elsewhere. Now, the testimony here, and so the court made mention of that, and said, well, you didn't find, you know, there's no evidence here that Mantec did that. But the important thing is that there was no evidence that there were any available positions to be had for people at this level. We're not talking about people at the bottom of the pyramid. We're talking people at the top. And, moreover, the evidence was that no alternative position was found for the other people that were in the same positions that were terminated at the same time. The deputy program manager, Nate Webster, who was let go at the same time as Mrs. Cody, no alternative job was found for him. And, likewise, with respect to Mr. Cody, there were two other senior executives that had been terminated in that same period of time. One before him, Robert Knight, and one after him, Daniel Doody, and that was part of Mantec's reduction in force to get down its overhead costs. And no alternative positions were found for them either. So there is no evidence upon which a jury could rationally conclude that the Codys were being treated worse than other employees, that there was something retaliatory going on. The fact of the matter is that Mantec, when it became aware of the complaint, put them on administrative leave, because that was the only viable course of action other than firing them immediately without having taken a look at their allegations. And then, during the course of time, and unrelated to the outcome of that investigation, it terminated Mr. Cody because of its pressing need to reduce its overhead costs. Its revenues had shrunk 45% over three years. That's huge. I mean, the company was in a very difficult situation, and it had to cut overhead costs and not let people go, including people like Mr. Cody that were senior, that had been with the company a long time, that had doubtless made contributions to the company before, but it had no choice. And likewise, with respect to Ms. Cody, when the job for which she had been hired and performed is eliminated by the customer over Mantec's protest, the company did what it had to do, which was to terminate her. And you cannot draw from those an inference of retaliation. Okay. You have some time reserved for rebuttal, but your time here is out. Thank you. Mr. Oswald? Good morning to you all. Scott Oswald on behalf of Muge and Kevin Cody, and I'd just like to take the three of you to Mantec Corporation. Imagine for a moment that you're an employee of Mantec Corporation, and a man comes down to the floor, a vice president, who you only have sporadic interactions with, and he tells you in the big bullpen area, I'm gathering up all the employees, and I want you to know that we are suspending your boss today. And not only are we suspending her, but we're walking her out of the building, and none of you, none of you are to talk to her. You're never to communicate with her. Not today, not ever. That's what happened at Mantec on January 12th of 2015. And that boss that that vice president was talking about was Muge Cody. Impressions matter. Signals matter. I mean, we as lawyers and as judges, we know that. I mean, instinctively we know that. That's why, for instance, that when a criminal defendant walks into the courtroom, we allow that criminal defendant to be out of shackles, in street clothes, right, when they go before a jury. Impressions matter. Kevin and Muge Cody were not criminals. They weren't the ones who were accused of any kind of wrongdoing at Mantec. They were the whistleblowers, the ones that Congress intended that they come forward and that enacted these two statutes, which are at issue in this case, to protect individuals who come forward under those circumstances. Yet Mantec, on January 12th of 2015, treats them as if they had done something wrong, when they had done exactly what the False Claims Act requires. They had filed a lawsuit under seal, notifying the government of their claims. That's what the statute requires under the circumstances. And yet for that act, and counsel for Mantec admits it, they're suspended from their duties. With pay, right? With pay, that's right. And bonuses? But suspended. They did have bonuses. That's exactly right. But here's the point. Your question about whether or not, right, a lawful act, right, was this a lawful act? A lawful act done for an unlawful purpose is retaliation. And that's what was done here. It was done for an unlawful purpose, and they admit that it was done for an unlawful purpose. Your argument that administrative leave can never, is never a proper process for an employer to engage in? No, not at all. In fact, let me give you an example of when it would be perfectly proper. Let's say that a manager is alleged to have engaged in sexual harassment. No, put it in the terms of what is alleged here. No, under this. So it's never appropriate? Not under this set of facts. Why? Because, remember, this is a lawsuit that was filed in 2013. So it had been under seal at this point for over a year. Muge Cody had been the program officer. She had dealt with the Army for over a year. And there's no allegation that she had been insubordinate. There's no allegation at all that she had done anything wrong. There was no allegation. There was stuff in the record about unhappiness with the way she treated people. You're right about that. And I'm glad you mentioned that. Do not misstate the record. You were the trial lawyer, so you know the record.  You know the record better than anybody else in the court, the two of you. Oh, I'm sorry. So don't tell me something that is not there. Forgive me. I'm sorry. That was not why they were suspending her, though. No. We went to the step of putting her on administrative leave with pay. That's not why they put her on administrative leave with pay. They put her on administrative leave for pay for filing the lawsuit, not for anything that she had done in the workplace. And the jury, just you raised the point, so I want to address it directly. There was direct evidence at the trial, and the jury could infer, that this was simply made up out of whole cloth by Mantec. The allegations that they put together here were not substantiated. There were no documentation to support any of the allegations. There were witnesses. There were witnesses, yes, there were. But they were all executives of the company. Well, who else is going to know? Well, okay, fair enough. But that's not the reason they gave them. It's not the reason why Mantec says we're suspending you. They're saying it's because you filed a lawsuit. And remember that that had occurred over almost two years before that point. So she had been operating on the contract as the program manager for two years after what Your Honor has just mentioned in this case. Did the Army ever give an explanation for why they terminated the program manager? You know, I'm glad you asked that question, because the answer is. . . I'm real glad this morning. Are you glad? Well, at least he hasn't told us it's an excellent question. That's true. I like it when lawyers say that. Go ahead, I'm glad. I'm glad to hear a positive attitude. I'm happy to be here, so I appreciate that. So we heard from Mr. Urbino, who was the contract officer. So he was the Army employee responsible for the contract. And here's what he said. He said that he had regular and close contact with Muge Cody. They talked all the time. Remember, she's working 18 hours a day on this contract. That is the testimony. She literally lived and breathed Mantec. Her husband worked at Mantec, Kevin Cody. He was there, too. They made the contract part of it. Let me be more specific with my question. On what page and line does the Army offer an explanation for why they terminated the program manager slot? I would say Joint Appendix 1337, where Alex Urbino from TACOM talks, number one, about the Codys. Joint Appendix 448 through 449, that's his testimony specifically. And then he goes on to talk about the person that Mantec replaced Muge Cody with. That's at Joint Appendix 451 through 452. And here's what he says. He says that Nate Webster is not very engaged. That's what he says. He never says that's the reason we terminated the program manager slot. No, but the jury is entitled to infer that, given the fact that there was not the kind of velocity the jury saw from what was going on after Nate Webster was placed into the position. And, again, the jury is entitled to take those inferences. Well, they can speculate if they have an adequate factual basis to do so. But when things get too far afield, then I start to get nervous. I get it. And so let me see. Because I think what your question is, what's going on, is that relevant? And let me just remind the court. No, that's not what my question is. It seems odd to me that when you have the Army representative testifying, nobody asking the question, why did you get rid of this position? Because I can't find that explanation anywhere. I find some speculation. We liked her. This guy wasn't as good. But they never say, but here's why we terminated the position, which is, I think, an important decision for the Army. Yeah, I get it. And I guess I would say to you that this is a sole source contract, at least initially. This is a contract that covers all of our troops and mine-resistant vehicles in Afghanistan. And so there was testimony at the trial that one of the reasons why the government didn't intervene to begin with was because they needed these mine-resistant vehicles to be fixed. But apparently they didn't need this program manager. You're right. What they didn't need was Nate Webster because he was the one in the position. But they never say that. I mean, that's why I'm always looking for them. They didn't say it directly. That's right. That's right. So then we just have to evaluate what they did say and see if it provides an adequate factual basis for the jury to be able to speculate as to what the reason was and that the reason was that your client was removed from the slot and put on administrative leave. But she wasn't removed from the slot by the Army. She was removed and placed out of that by Mantec. The jury was entitled to infer that had she not been removed, she might have remained in that position for the foreseeable future. Okay. They remove her, right? And then here's what's interesting about it is that Mantec says we are going to now eliminate you, Muge Cody. She's not the person in the position anymore. But she is very much vulnerable. And we have testimony about that. And, Your Honor, you asked the question about the issue of whether or not Mantec generally will provide, try to find other positions for employees. The testimony was that that's exactly what Mantec generally did. They never did that here. The Muge, the Codys, both Kevin. Identify to that. A Mantec employee? Yes, Your Honor. And let me give you. Clients? So that was at Joint Appendix 654. That was Terry Myers, who was the head of compliance and ethics at Mantec at the time. And the reason was simple, that they didn't. Because the Codys were ineligible for any other position. The record shows that once they were placed, they were suspended. And they were placed in administrative leave. They're not eligible for any other position. And they're tremendously vulnerable. Why? Because they're indirect. They're no longer billing to any contract. And so it really is entirely foreseeable that this would have happened. Kevin Cody was riffed. There's no question about that. And there is a list of individuals in that first quarter. Let me ask you a question about that. I need to ask this question before you run out of time. Yes, sir. I'm looking at the testimony of Mr. Cook. It's on page 983. And the question is this. Before Mantec terminated Kevin Cody, Mr. Keefe told you the termination would occur. Answer, yes, he did. What is the significance of that testimony? Is that some indication that they planned to terminate him earlier than he actually got terminated? Or they said they made the decision to terminate him? I couldn't understand. I didn't know if that was significant or not significant. So you tell me. I completely get it. I think what that refers to is a conversation between Keefe and Bonnie Cook that occurred in 2014. Well, let me tell you. I'll read you a little bit of the testimony ahead of it. So Mr. Keefe, question. Mr. Keefe and Kevin Phillips told you, though, that the Codys were put on administrative leave because they had sued Mantec and were business leaders for a prominent contract. Answer, yes. Question. Before Mantec terminated Kevin Cody, Mr. Keefe told you the termination would occur. Yes, he did. Does that ring a bell at all? It must not be significant. Well, I think what they were trying to show was that somehow the CFO at the time, who was Mr. Keefe, he was, excuse me, Mr. Phillips, Kevin Phillips, that he had made this decision sometime in 2014 rather than sometime after the filing of the law. So I think that's where it was going. The point is, though, is that actually undercuts their position as well. And the reason it does is that there's nothing contemporaneous that supports that. Not one document, no email, no nothing from 2014 that supports that Kevin Phillips had made this decision in 2014. So what the evidence shows is that this was a decision made in 2015 and that it was made at or about the time of the administrative leave. That's what the evidence shows and the documents support it. Kevin Cody was the only executive, the only officer that was fired in that first quarter in this RIF. It was a RIF of one, at least at his level, and there were at least two people, Brogan and another employee who were in fact retained at that time. So we have the words from Mantec that why they took the decision itself. We have the circumstantial evidence that supports the notion that this decision was made because they were on administrative leave, that they were not billable on a contract. It was entirely foreseeable that what would happen here actually happened. And I wanted to stress the importance of the letter suspending them. And there's no doubt that Mantec concedes that they were suspended. It's on the second page of their reply brief where they use exactly that word. They, at that point, they say we're doing this because of the fact that you filed a lawsuit. What message does that send to every other employee? Your time is up. You can use it now or you can use your rebuttal time. Remember, there's the cross appeal, which nobody's talked about. Yes, Your Honor. Thank you very much. I'll just finish. But this goes against your rebuttal time. I get it. Go ahead. I was just going to say that what kind of message does it send, right, to the employees on the floor that they gather on that day, that this is what happens to people who are whistleblowers. And it's important that neither Kevin or Muge Cody ever saw the ends of Mantec again. That was their last day of employment, at least their last day inside doing gainful employment, active employment at Mantec. I'll reserve the remainder for rebuttal. Thank you. Mr. Kluge? I'd like to take issue with several things that were said. Number one, on this whole notion that they're whistleblowers, the Codys abandoned their false claims charge. Mantec moved to dismiss it, and rather than oppose that motion, they filed their amended complaint in which they abandoned it. The record is crystal clear on that. There was no testimony, as was suggested, that the government chose not to intervene in this case. You're not suggesting that they still weren't entitled to the protections of whistleblowers simply by dismissing the claim, are you? No, Your Honor, I'm not. They just made a retaliation claim. Their basic claim is gone. The notion here is to get sympathy for a whistleblower, and I'm saying we don't have ultimately legitimate whistleblowers. This devolved into a suit about whether Mantec retaliated against them for filing baseless allegations. That's how this case played out. All of the original allegations. If they were baseless and, I guess, done with an evil intent, they could have been fired, right? I submit that that's the case, Your Honor. But, again, that's not our defense, and that's not what Mantec did. When the charges were unsealed, Mantec took what I submit is the only responsible approach that a government contractor could have taken in that situation, which is to put the people that are senior, that are publicly accusing them of defrauding their biggest customer on their biggest contract, on the sideline, defer taking any action against them, pay them fully, bring in an outside expert to look at their allegations. Now, what else could Mantec have done in that situation? I submit that that is the height of responsible conduct. Number two, there's some discussion about Mr. Cody's termination. Mr. Phillips, who was the CFO, testified that in September 2014, when he let Robert Knight go, one of the people that was at a comparable level to Mr. Cody, he realized that there were two other people that were on the bubble, and they were Kevin Cody and Daniel Doody. Two other people that were what? On the bubble, Your Honor. On the bubble. To use maybe an NCAA. And that unless Mantec was successful in securing some significant new business in the next few months, that they were going to have to be terminated at some point in 2015. Is that what that testimony that Judge Traxler was asking about goes to? The clip was so short, I couldn't even tell. Mr. Cody, I'm sorry. It sounded like your colleague on the other side resisted it. It was helpful for you. I don't think there was any testimony that Mr. Phillips, having made this decision, he said he went and discussed it with George Peterson, who's the head of the entire company. He didn't say he discussed it with Mr. Keefe, so I doubt that the thing you're talking about deals with that. I suspect it's more prosaic simply that when the decision was made to put them on administrative leave, that the senior officials, the other senior officials were told they're going to be put on administrative leave. I suspect that's what that goes to. But didn't the leave, as your colleague indicates, have some adverse consequences in terms of their limited ability to find other employment? No, because as I said, Your Honor, there was no evidence. And the burdens on them, as the plaintiffs, there was no evidence that there were positions that they could have fit into at their level. And indeed, the evidence showed that the comparable people that were being let go did not have positions found for them. Nate Webster, who was a direct charge at the point as the acting program manager, was let go. No alternative job was found for him. When Robert Knight and Daniel Doody were let go, Knight in September of 2014 and Doody in August of 2015, no comparable positions were found for them. And, of course, Mantec wanted to lose their salaries. That was part of the overhead problem that they had here. These were very highly paid senior executives in a company that can no longer afford to carry that kind of overhead structure because its business base has shrunk by 45%. And so when counsel suggests that there is nothing in writing, well, when you're the top official in the company and you're thinking about having to let go other senior officials, you don't write memos to the record saying, September of 2014, I'm thinking that I may have to let these two senior guys go next year. That is not how life operates. And to suggest that there needs to be some sort of written evidence of that is, I suggest, unrealistic and not credible. But it all comes back to ultimately this. The Cody's clearly did not make out a prima facie case on the False Claims Act count. Mantec came forward with legitimate non-retaliatory reasons for terminating both of them. The RIF in the case of Kevin Cody, the Army's decision to terminate the program manager position in the case of Ms. Cody. The Cody's offered no evidence whatsoever, as they were obliged to do, that those reasons were false or pretextual. There was no evidence of pretext introduced. That means, clearly, as a matter of law, they didn't carry their ultimate burden of proof either on the False Claims Act count. Now, it remains our position that the evidence was insufficient to make a prima facie case on the DCWPA count either, even under the contributing factors standard. But if the court disagrees, let's turn then to the remaining question, which is, did Mantec carry its burden of proof to establish by clear and convincing evidence that the filing of the suit was not the but-for cause of their termination? And I submit to you that the evidence is clear on that. The courts, when they're looking at that issue, have said that there are three factors that are key. The first one is, how good is the reason for termination? And I submit to you that the evidence here is compelling in both cases. The Army eliminating the program manager position for Muge, the loss of business for Mr. Cody. Number two, was there any motive on the part of the officials that made the decision to retaliate? And there's no showing that Kevin Phillips had a reason to retaliate against Kevin Cody or that Mike Brogan and Dan Keith had a reason to retaliate against Muge. And finally, the courts say, what happens to other employees in comparable positions? And again, the evidence squarely supports what happened here because comparable employees who were not list employers lost their jobs at the same time for the same reason. Thank you very much. So I think that the district court was right. Judge Stringer was right that the Codys have met either burden and for the reasons that he outlines. But I want to point out one important thing, and that is, we proffered and the district court agreed that the Mantec has waived this issue of the higher standard of burden of proof. And the reason is they just simply didn't preserve it. I know that that's true. Have you gone and looked at Hart and Miller? I have, but here's the thing. It seems to suggest that you don't lose it. Well, here's why I think they do. And I look at, you know, the case law, the Air Sea Forwarder's case as an example. The key is at least you've got to raise it at the close of all of the evidence, the 50A motion, plaintiff's case in chief, or at least at the close of all the evidence. I think you'll find if you look closely at the record, Joint Appendix 1419, there is no interposition of this, the fact that a higher burden of proof should apply, nor at the close of all the evidence at 1511 Joint Appendix, nor before the jury was charged at Joint Appendix 1520. So you're not just relying on the fact that they didn't object to the jury instruction? No, I'm not. In fact, I think you'll find that there is no specific nothing in the record where at the close of the plaintiff's case in chief,  again, Joint Appendix 1419, Joint Appendix 1511, and Joint Appendix 1520. So I believe that issue has been very much waived. I want to address, if I could, the issue of the compensatory aspect of this. And in Rule 50 motion they did it, right? Well, I believe that there was not a, if you look at the end of the evidence, there was not, two weeks after trial, yes, it was raised then, we agree with that, but not at the close of the plaintiff's case in chief, not at the close of all the evidence. I think you'll find that that was not interposed at that time. So when do you say it was raised? It must have been at the close of all the evidence, which was two weeks after trial. I don't know how the trial went. Often there's a delay between the, anyway, you tell me. When do you believe it was raised? It was in the post-trial briefs that it was first raised. So it was not during the trial where the court could have considered it and corrected an error to the extent it is error. I don't believe that it was properly preserved on the record. I want to turn to the other issue here, which is the issue of the compensatory damages. And to begin with, the statute uses the term special damages. And this court in the Jones case, that's Jones v. South Peak, which is 777 F. 3rd, 658 at 652, says that includes compensatory damages, loss of enjoyment of the position, reputational harm, and emotional distress. And the evidence of this case shows that we have a little of each of those, really. Kevin Cody testified at trial that he began, as a 24-year employee, he began at Mantec as a tech. He worked through Mantec. He received his bachelor's degree, his master's degree. He worked in a progressive number of positions at Mantec. He saw himself as a company man. His own ego was inextricably intertwined with the company itself. It was the only company he really had ever known. And he had built this contract. He had bid on it initially. He was the one out in front on it. And the record further shows that he met his wife at Mantec, Muge Cody, the other plaintiff in this case. They married. All of the people at their wedding were Mantec employees. Their wedding party were all Mantec employees. They literally lived and breathed this contract, Mantec. And Muge Cody talks about the fact that how their own sense of self really was Mantec and this contract. How she felt there was a trust relationship between her and the company. The fact that she looked at all of her employees as family. And to be told on this, after all of this work, years in Kevin Cody's behalf. You tell me what legal point you're arguing. I think it's a great jury argument. I'm ready to give you a verdict. But I don't understand what legal point you're voicing. So these were within the ambit of compensatory damages. There was evidence. There was testimony, Your Honor, that would support the notion that the jury's award of the $500,000 to Kevin Cody, the award of the $300,000 to Muge Cody, was in fact based upon evidence that was gleaned at the trial. And the court, remember, didn't just remit. It vacated the award entirely to zero. So to the extent. I'm talking about his cross appeal now. Right. Which I don't actually know you're allowed to do because you didn't raise it first time around. So it's not rebuttal to anything. Go ahead. Oh, I'm sorry. Because there's a cross appeal. Forgive me. So you're supposed to raise it. If it's an appeal, you raise it. Then they get a chance to respond to it. Then you do the rebuttal to that and only that. But that's all right. Go ahead. That's all right. I understand. So I believe that there's sufficient evidence here to support the notion that some award. And look, I'll be the first one to say that there's no mathematical formula for sure. And maybe the court believes that it should be reduced to some degree. But there should at least have been some award that remained at that point. And what the court did in error in vacating, slicing the whole thing away, was error. And that this court should remand for trial for the court either to remit the amount to the extent the court believes that that's appropriate or permit a new trial on the issue of those compensatory damages. Can I go back to your preservation argument? I just want to be sure I understand that you're making a representation to us that Mantech never moved for judgment as a matter of law under Rule 50B at the close of your case in chief. Is that correct? They did move for motion as a judgment as a matter of law, yes. No, they did do that. Okay. And then they did it at the end of the close of all the evidence? Yes. Okay. But they didn't raise this argument. I thought you said you meant, well. So the argument is that somehow that the higher standard of proof should apply. Yeah, I understand. Thank you. Okay. We'll come down and greet the lawyers and then maybe take a brief recess.
judges: Diana Gribbon Motz, William B. Traxler, Jr., Albert Diaz